258 F.2d 883
 The TRINITY UNIVERSAL INSURANCE COMPANY, a corporation, Appellant,
v.
James G. GOULD, Appellee.
James G. GOULD, Cross-Appellant,
v.
The TRINITY UNIVERSAL INSURANCE COMPANY, a corporation,
Cross-Appellee.
 Nos. 5782, 5783.
 United States Court of Appeals Tenth Circuit.
 Aug. 7, 1958, Rehearing Denied (No. 5782) Sept. 15, 1958.
 
 Gerrit H. Wormhoudt, Wichita, Kan. (Homer V. Gooing, Wayne Coulson, Paul R. Kitch, Dale M. Stucky and Donald R. Newkirk, Wichita, Kan., were with him on the brief), for appellant and cross-appellee.
 Arthur N. Turner, Newton, Kan., and William P. Thompson, Wichita, Kan. (C. Fred Ice, Newton, Kan., A. W. Hershberger, Richard Jones and H. E. Jones, Wichita, Kan., were with them on the brief), for appellee and cross-appellant.
 Before MURRAH, PICKETT and LEWIS, Circuit Judges.
 MURRAH, Circuit Judge.
 
 
 1
 Appellee Gould brought this diversity suit against appellant, Trinity Universal Insurance Company, to enforce the penalty on its surety bond for the performance of a contract between Gould and Abney for the construction of Gould's dwelling. Trinity asserted a material alteration of the construction contract which worked a breach and discharge of the bonded obligation. This appeal is from a judgment in favor of Gould on the surety bond in the approximate sum of $12,000. The cross-appeal challenges only the amount of the award.
 
 
 2
 The construction contract obligated Abney to construct the dwelling for Gould according to specifications for the sum of $25,000 and to complete the same on or before May 1, 1951. The contract contained the conventional ten percent retainage, and also provided for changes and alterations without change in the contract price, unless the contractor, before making such changes and alterations, notified the owner in writing of the added cost, in which event Gould had the election whether to proceed with such changes. In conventional language, the bond guaranteed the performance of the construction contract in the principal amount thereof, provided among other things that the obligee should retain ten percent of the contract price until complete performance; and that 'no change shall be made in such plans and specifications which shall increase the amount to be paid the principal more than ten percent of the penalty of this instrument without the written consent of the surety.'
 
 
 3
 During the course of the construction of the dwelling, numerous changes were made in the plans and specifications, but only two items in the aggregate of $1,425 were submitted in writing by the contractor for additional cost. Early in May, the contractor orally agreed with Gould's father-in-law to construct a porch and certain other alterations in the kitchen and family room, in accordance with separate plans and specifications on a cost plus ten percent basis, estimated to be $5,000. On April 25, 1951, $12,888.23 had been paid on the $25,000 contract price. The house was not completed on May 1, 1951, and Abney and Gould agreed that Abney would continue performance of his contract. Abney failed to pay material and labor bills as they became due, and on or about May 10, 1951, Gould began to pay one hundred percent of the cost of work on the residence on certification of the labor and material bills. The bills were paid either through Abney's controlled bank account, or directly through Gould's account in the same bank. In August Abney had been paid the sum of $26,464 and the dwelling was not complete. When Abney expressed a disposition to leave the job, the father-in-law offered to pay him not less than a $2,000 bonus in lieu of his prior separate cost plus agreement with him if Abney would 'stay on the job and complete the house'. Abney finally left the job unfinished on October 8, 1951, at which time a total of approximately $40,000 had been paid to him or for his account. Thereafter Gould completed the house at a total cost of $63,021.38. Gould first notified the surety in writing of the default on October 11, 1951.
 
 
 4
 The surety takes the position that the cost of the changes and alterations made by agreement between Gould and Abney and paid for by Gould, without the surety's consent, exceeded ten percent of the penalty of the bond, and it is agreed that the changes authorized by the father-in-law exceeded this amount. Gould argues, however, that the changes authorized by the father-in-law were paid by him under a separate independent contract, which in no wise prejudiced the bonded obligation; that with respect to the other changes and modifications, only $1,425 was submitted in writing for additional cost; that it must therefore be presumed that all other changes were within the contract price; that Abney simply undertook to build the house too cheaply; and that the bonding company should have known it.
 
 
 5
 The record does not show the cost of some sixty-seven changes or alterations; on attempt was made to segregate them; indeed, no attempt was made to segregate the cost of the father-in-law's additions and alterations. All were paid from a common account. From the nature of the alterations, it seems fairly inferable, however, that the cost of those made without written notification greatly exceeded the allowable ten percent of the contract price. At the same time, it is arguable that inasmuch as the contract contemplated changes and alterations without change in the contract price unless submitted in writing and approved by the owner, all changed and alterations except those so approved carried no additional cost in excess of the contract price.
 
 
 6
 It is of course almost axiomatic that any change or modification of the construction contract which materially increases a compensated surety's risk discharges the obligation. See Restatement Security 128. On the other hand, contracts of this kind conventionally contemplate changes and alterations in the specifications; and any change or modification which does not materially affect the risk is inoperative. See Williston Contracts, Vol. 4, 1239, 1240, 1241. The trial court made no specific finding on whether the changes and alterations agreed to between the parties without the consent of the surety exceeded the allowable tolerance under the bond, hence effected a discharge. Its judgment, however, presupposes a material alteration of the construction contract and a resultant breach of the surety bond, for it rests squarely upon the alternative grounds of equitable waiver. In that regard, the court specifically found that during the course of the construction, Gould informed Trinity's local policy-writing Manager of all the developments in connection with the building contract, including the failure of Abney to complete the building on May 1; the agreement of Gould and Abney that Abney would continue the work; the change in the method of payment; the written statements of additional cost by reason of changes; and the cost plus agreement between the father-in-law and Abney. The court found that on July 3, 1951, the local representative advised the responsible agents of the company that there would be a definite shortage on the contract; that from time to time the local agent advised his superiors of all the information concerning the contract by telephone, letters and progress reports; that with this knowledge, the local agent was advised to 'use his best judgment and go ahead and do the best you can', and the surety took no other steps to protect itself after being informed of the facts by its local agent. The surety may of course waive a breach of its bond by consenting to the material alterations of the bonded contract. Our decisive question is whether the trial court's findings to that effect are clearly erroneous.
 
 
 7
 While the surety may waive the breach, mere knowledge of the breaching alterations does not amount to requisite consent, nor does knowledgeable silence give consent. It was under no duty to declare a breach of the bond even with knowledge of material alterations of the construction contract. Citizens Building & Loan Ass'n of Emporia v. Jones, 149 Kan. 302, 89 P.2d 633, 636; Cure v. Midland Life Ins. Co., 109 Kan. 259, 198 P. 940; Musgrave v. Equitable Life Assur. Soc., 124 Kan. 804, 262 P. 571; Johnson v. Dumond, 130 Kan. 516, 287 P. 249. See also Annotation, 101 A.L.R. 1310. But, as a compensated surety, Trinity owed its patron the duty of good faith which ascends the morals of the market place-- a duty not to deceive or mislead. Any course of action with knowledge of the breach which can be reasonably construed to indicate a disposition to continue the suretyship relation works a waiver of the breach. Jack v. Craighead Rice Milling Co., 8 Cir., 167 F.2d 96; Sormanti v. Deacutis, 79 R.I. 361, 89 A.2d 191; Spring Garden Building & Loan Ass'n v. Rhodes, 126 Pa.Super. 102, 190 A. 530.
 
 
 8
 It is an established fact that the surety's local bond-writing agent was present and familiar with all of the critical facts until September 1951. And, while it is agreed that he had no authority to alter or waive any provisions of the bond, it cannot be doubted that he was an effective conduit for the conveyance of information to his principal. And, it is undisputed on this record that he did advise with Gould from the time of the work lag under the contract in May 1951 until he left the employ of the company the following September. Gould discussed with him the various changes and variations in the construction. And, while they did not discuss dollar value, the local representative did in turn discuss generally such changes with his superiors either at the office in Dallas, Texas, or the General Agent in Topeka, Kansas. He knew of the father-in-law agreement and so did the surety. When Gould and Abney made changes, when Abney's checks to the materialmen and workmen were unpaid and Gould took over the responsibility for paying the bills, when the completion date was extended and the ten percent retainage clause waived, the surety was informed and had no objections. And, Gould was so advised. This course of conduct is certainly susceptible of the inference that the appellant affirmatively acquiesced in the material alterations of the contract, and thereupon waived the right to insist upon a breach. In these circumstances, we cannot say that the trial court's judgment based on waiver is clearly erroneous.
 
 
 9
 The trial court did err in allowing the plaintiff interest from the time of original notice of Abney's abandonment to the surety on the amount finally determined to be due the plaintiff as damages. Under Kansas law, interest is not allowed on unliquidated claims in the absence of unreasonable and vexatious delay of payment. Leader Clothing Co. v. fidelity & Casualty Co., 10 Cir., 237 F.2d 7; Southern Painting Co. of Tenn. v. United States, 10 Cir., 222 F.2d 431; Winfield Mortgage & Trust Co. v. Robinson, 89 Kan. 842, 132 P. 979. In view of the perplexing questions of breaches of the bond and waiver here, it cannot be said that the defendant's refusal to pay under the bond was unreasonable or vexatious delay. Certainly the damages were unliquidated, as evidenced by the cross-appeal, which we now consider.
 
 
 10
 'Cross-Appeal
 
 
 11
 The sole question involved in the cross-appeal is whether substantial evidence supports the trial court's finding of the amount of damage suffered by the plaintiff as the result of the defendant's refusal to perform under its bond.
 
 
 12
 The court based its findings of amount of damage on the testimony of a Wichita contractor as to his opinion of the cost of doing the work originally contracted for, less the contracted price. Gould says his testimony is unreliable and contends recovery should be based on the testimony of other experts as to the cost of the father-in-law's addition and other modifications for which he accepts responsibility subtracted from the total cost to Gould of completing the house. It is sufficient to say that since substantial evidence supports the finding of the trial court, credence will be given to such judgment. Kansas City Public Service Co. v. McMullin, 10 Cir., 142 F.2d 116; Smails v. O'Malley, 8 Cir., 127 F.2d 410.
 
 
 13
 The judgments on the appeal and cross-appeal are affirmed, except for the award of interest.
 
 
 14
 LEWIS, Circuit Judge (dissenting).
 
 
 15
 It seems most apparent to me that the merit to this appeal lies in the contention of appellant that the building contract, the performance of which the surety company bonded, was utterly abandoned by the contractor and appellee and that the home as ultimately built was constructed under a working agreement between the contractor and appellee which was far removed from the written contract which limits appellant's liability. Sixty-seven substantial changes were made in the plans. The contemplated contract cost of $25,000 resulted in a house the reasonable cost of which was admittedly in excess of $63,000. Method of payment of costs, the amount and method of payment of the contractor's fee, the time for completion of the work, all were changed from the original agreement which appellant bonded. No attempt was made by either contractor or owner to keep records showing the cost or value of changes. And at the time the contractor walked off the job, with the project but then two-thirds complete, he had been paid over $40,000, a sum in excess of $15,000 over the contract price. And even then he was urged to keep working. Surely this indicates that the original contract had been abandoned, not breached. I can see no room, therefore, for the application of the doctrine of waiver and would apply the elementary rule of suretyship:
 
 
 16
 'd. The obligation of the surety to answer for a particular duty of the principal does not mean that he is bound to the creditor for a different duty of the principal. Where, for example, the creditor and principal substitute and entirely new obligation for the original one, the surety is discharged. Where a new agreement materially changes the old one, the result is the same. The present obligation of the principal is not the one guaranteed by the surety.' Restatement of Security, Sec. 128, Comment d, page 342.
 
 
 17
 Although I would dispose of this controversy by holding the surety harmless I must note further disagreement with the majority in the holding that substantial evidence supports the trial court's finding as to damage in the amount of $12,853. Both appellant and appellee agree that there is no competent evidence to support this amount, appeallant contending that there is a total failure of proof as to amount of damage and appellee contending that the full amount of the bond should be forfeited. Both agree, and the record is clear, that the expert testimony resulting in an estimate of the cost of performing the original contract was based upon two factual premises neither one of which was present in the instant case. The witness based his estimate upon the assumption that the contractor would work out of Wichita, Kansas, and would hire union labor. The home was built at Newton, Kansas, and the contractor was not required to hire union labor.