275 F.2d 97
 WYOMING CONSTRUCTION COMPANY, a Wyoming corporation; and
Monolith Portland Midwest Company, a corporation, Appellants,
v.
WESTERN CASUALTY AND SURETY COMPANY, a corporation; Forgey
Construction Company, a Wyoming corporation; and Orrin B.
Forgey, Russell Forgey, Chas. S. Chapin and W. J. McNamara,
individually and as co-partners doing business as Forgey
Brothers, Appellees.
 No. 5991.
 United States Court of Appeals Tenth Circuit.
 Jan. 26, 1960, Rehearing Denied Feb. 24, 1960.
 
 Norman Elliott and Joseph Enright, Los Angeles (Loomis, Lazear & Wilson, Cheyenne, Wyo., Corthell & King, Laramie, Wyo., and Enright & Elliott, Los Angeles, Cal., were with them on the brief), for appellants.
 William H. Brown and Edward E. Murane, Casper, Wyo. (Brown, Healy, Drew, Apostolos & Barton; Murane, Bostwick & McDaniel, and Donald E. Chapin, Casper, Wyo., were with them on the brief), for appellees.
 Before BRATTON, LEWIS and BREITENSTEIN, Circuit Judges.
 BREITENSTEIN, Circuit Judge.
 
 
 1
 Appellee-plaintiff, The Western Casualty and Surety Company, a compensated surety on a construction contract performance bond, brought this action for indemnity to recover its costs in completing the contract after default by its principal.
 
 
 2
 The United States, acting through the Bureau of Reclamation, Department of the Interior, contracted with S. J. Groves & Sons Company for the construction of the Big Sandy Dam and Dike in western Wyoming. Groves subcontracted the earth embankment and riprap on the dam to Forgey Construction Company which, in turn, subcontracted the riprap work to Wyoming Construction Company. Western was the surety on the performance bond given by Wyoming to Forgey. Wyoming failed to complete and performance was taken over by Western. During the period involved, Wyoming became a wholly-owned subsidiary of appellant Monolith Portland Midwest Company. The Jury verdict, in favor of Western and against Wyoming and Monolith, was for $74,677.33 to which the court added $25,701.45 as interest and entered judgment for $100,378.78.[1] This appeal is from that judgment.
 
 
 3
 Wyoming contends that Western is not entitled to indemnity because an antecedent default of Forgey relieved Wyoming of its obligation to perform and such default and its effect were known to Western. All pertinent contracts required completion of performance by November 29, 1951. The riprap work of Wyoming had to follow the placing of embankment by Forgey but could advantageously proceed as the embankment rose in height. On the contract termination date Forgey had placed more than 90% Of the embankment materials and Wyoming had placed less than 10% Of the riprap. The breach by Forgey, upon which Wyoming relies, is the failure of Forgey to complete the embankment by November 29, 1951.
 
 
 4
 The issue as to whether Wyoming was excused from performance because of the alleged breach by Forgey was submitted to the jury under adequate instructions and the jury by its verdict adverse to Wyoming on all issues necessarily found that the conduct of Forgey did not excuse Wyoming. Substantial evidence in the record sustains such conclusion.
 
 
 5
 There were four principal stages in the riprap operation covered by the Forgey-Wyoming subcontract.[2] The material had to be quarried at a site about 26 miles from the dam, crushed to the right size, hauled by truck to the dam, and placed on the dam. Wyoming delayed in carrying out preparatory work such as building an access road and opening the quarry with the result that it did not start placing riprap until about the end of August 1951, when the embankment was more than 60% Complete. An employee of Wyoming testified that at no time after Wyoming began operations in August was there unavailable an area for the placement of riprap. The inability of Wyoming to put on riprap as fast as the dam went up was due to inadequate crushing and loading equipment and to the lack of trucks for hauling.
 
 
 6
 The testimony of Wheeler, the president of Wyoming until June 1952, was that in September 1951 he, as the responsible executive of that company, decided that it would be impossible to complete by the contract date and that it would be necessary to work through the winter. The record shows that no failure of Forgey to complete the preliminary work hindered or delayed Wyoming and that Wyoming made no effort to keep up with the progress of Forgey. These facts, coupled with extensions of the termination date obtained with the assistance and acquiescence of Wyoming, require the conclusion that no default of Forgey relieved Wyoming of its duty to perform. The situation in which Wyoming found itself was the result of its own acts.
 
 
 7
 Wyoming next urges that the extensions of the date for completion of performance were material alterations of the contract which discharged the surety. In support of this contention it points out that construction work in western Wyoming is more costly in winter periods because of severe weather conditions and that the contract contemplated the work would be completed before the winter season.
 
 
 8
 The contracts involved all provided for an extension of the performance date.[3] Chapin, an officer of Forgey, testified that prior to the execution of the Forgey-Wyoming contract he and Wheeler discussed the possibility 'that this job would go into the winter or the following spring.' As early as September 1951 Wheeler refused to commit more of the Wyoming equipment to the job because he then realized that winter work would be required. The matter of extension of performance time was discussed in correspondence between the Bureau, Groves, Forgey, Wyoming, and Western as Wyoming's surety. There is no evidence that any party, except the Bureau, was opposed to any extensions. The Bureau granted extensions, the last until July 17, 1952.
 
 
 9
 The failure to perform on time did not terminate the contract.[4] We are not concerned at this point with possible rights to damages for delay but with the issue of whether the extensions relieved the surety of liability. Western was a compensated surety. It knew from its own investigations that the job would not be completed on the contract termination date. As Wyoming had but 9.9% Of its work done on the termination date it was to the advantage of both Wyoming and Western to have the date extended. Neither was harmed thereby.[5] Whatever additional costs there might have been to Wyoming were the result of Wyoming's conduct in failing to keep apace with Forgey.
 
 
 10
 This is not an action by an obligee to collect from a surety. Rather, it is an action by a surety which has performed in the place of its principal and which seeks to collect from its principal under a written contract of indemnity. That contract authorized the surety 'to consent, from time to time, to any extensions, modifications, changes or alterations of, or additions to, said contract, * * *.' While no formal written consent was executed, the conduct of Western is consistent only with consent to the extensions.
 
 
 11
 The equities of the situation cry out against Wyoming. By starting late and using inadequate equipment it failed to keep abreast with the progress of Forgey. It led all parties to believe that by winter work it would catch up with Forgey and complete the riprap promptly after the completion of the embankment. It did not object to the extensions but instead aided in their procurement. If failed to do the job it had contracted to do. Now, after the work has been completed by its surety and the surety seeks indemnity, Wyoming asserts that the situation which resulted from its wrong relieves it of liability to its surety. Such argument does not commend itself to the court. A party may not take advantage of its own wrong.[6]
 
 
 12
 The other claimed material alterations of the Forgey-Wyoming contract relate to the advance by Forgey to Wyoming of part of the purchase price of a crusher and numerous advances on a yardage basis to pay lease truckers. These advances were made by Forgey because of the financial condition of Wyoming. They were credited against payments to Wyoming when those payments became due. Granting that in some circumstances an advance payment may be a material alteration of a contract,[7] such is not the case here and even if it were, Western knew of the payments and did not object to them. As the acts of Western were consistent only with a disposition to continue the suretyship relation, it waived whatever right it might have had to take advantage of the changes in payment.[8] The advances were to the benefit of Wyoming. That company may not now hide behind its own acts and use the consequences thereof to avoid liability under the indemnity agreement.
 
 
 13
 Wyoming further says that Western breached its duty to act in good faith. We have no doubt that a surety must act in good faith in its dealings with its principal.[9] In the situation here, Wyoming knew the facts at least as well as its surety. The legal rights and obligations arising from those facts were known to both. There is no evidence of misrepresentation, concealment, overreaching, or undue persuasion on the part of Western. To the contrary, Western acted with candor and patience and gave Wyoming every opportunity to perform its contract.
 
 
 14
 Only one facet of the bad-faith charge merits comment. Wyoming says that Western acquiesced in Forgey's notice of default and did not assert the antecedent breach and material alteration defenses which were available. A suffcient answer is that such defenses, for reasons heretofore stated, were not available to either the principal, Wyoming, or to the surety, Western. Each, by its actions, had lost its right to assert those defenses, if either or both ever had such right. Be that as it may, the conditions existing at the time of the Forgey default notice and demand show that if there was any bad faith it was on the part of Wyoming, not on the part of Western.
 
 
 15
 As of May 31, 1952, Forgey was 90% Complete and Wyoming 34%. In mid-June, Wyoming stopped the placement of riprap, stacked its machinery and equipment, and laid off its employees other than supervisors. The work was at a standstill. By letter dated June 27, 1952, Forgey gave Wyoming a notice of default stating that it, forgey, would take over the work on July 2, 1952. At the same time, Forgey notified Western to perform under its bond.
 
 
 16
 A meeting attended by all interested parties was held on July 14, 1952. Wyoming, then under the domination and control of Monolith, refused to finish the job and Western assumed the responsibility of completion. At the time no protest was made by either Wyoming or Monolith. The subsequent formal protest, which did not state any substantiating grounds, did not detract from the good faith of Western. Here again the equities are with Western, which performed, and against Wyoming, which defaulted.
 
 
 17
 Monolith asserts that as it is a corporate entity, separate and distinct from Wyoming, it may not be held for the breach by Wyoming of a contract to which it, Monolith, was not a party.
 
 
 18
 Western relies upon the so-called instrumentality rule under which it says that Wyoming is to be regarded as a department or agent of Monolith with the result that Monolith is responsible for the defaults of Wyoming.
 
 
 19
 In Taylor v. Standard Gas & Electric Co., 10 Cir., 96 F.2d 693, 703-705, this court said that the instrumentality rule is not yet defined 'with a degree of certainty that it can be applied as precise yardstick in the admeasurement of legal rights,' and referred to ten circumstances which are important and controlling if present in the proper combination. The Taylor decision was reversed by the United States Supreme Court in Taylor v. Standard Gas & Electric Co., 306 U.S. 307, at page 3-2, 618, 59 S.Ct. 543, at page 550, 83 L.Ed. 669, the Supreme Court saying, that the instrumentality rule is not properly speaking a rule 'but a convenient way of designating the application, in particular circumstances of the broader equitable principle that the doctrine of corporate entity, recognized generally and for most purposes, will not be regarded when so to do would work fraud or injustice.'
 
 
 20
 In a recent case arising in Colorago, Fitzgerald v. Central Bank and Trust Company, 10 Cir., 257 F.2d 118, 120, this court said that the conditions in which the faction of separate corporate existence may be disregarded, or the corporation treated as the alter ego of its members, necessarily vary according to the circumstances and 'in general terms that the doctrine is an equitable one appropriate for application to prevent fraud, injustice, or wrong.' Applicability of this rule in Wyoming is established by Caldwell v. Roach, 44 Wyo. 319, 12 P.2d 376, 380-381, where it was said that 'the legal entity of a corporation will be disregarded whenever the recognition thereof in a particular case will lead to injustice.'
 
 
 21
 At the time of the execution of the Forgey-Wyoming contract the stock in Wyoming, with unimportant exceptions, was owned by Wheeler and his wife. Wyoming supplied gypsum to Monolith.[10] The Monolith contract was proftable to Wyoming, which did not allocate to the Big Sandy job equipment used on its gypsum production project.
 
 
 22
 In the fall of 1952 Wyoming was having financial trouble. It applied to Monolith for help. On January 14, 1952, Monolith advanced $25,000 which Wheeler, the president of Wyoming, considered an advance on a $75,000 open line of credit. On the same date all of Wyoming's stock was assigned to Monolith or its nominees with a repurchase option if the indebteness was repaid.[11] It was not repaid and the option was not exercised.
 
 
 23
 As part of the January 14 transaction in which Nonolith advanced the $25,000, Wyoming took appropriate corporate action to surrender completely its power to conduct its own business without the approval of Monolith.
 
 
 24
 Although Wheeler was continued as president of Wyoming until May 1952, his efforts to complete the Forgey contract were frustrated by the Monolith control. Monolith, which in January had advanced funds to Wyoming employee, acting as an offcer of Wyoming, shut down the job. When the meeting was held to determine what should be done about the completion of the Forgey contract, the Monolith employees who were acting as officers of Wyoming phoned their Monolith superiors for directions before stating the Wyoming position to proceed no further on the contract.
 
 
 25
 The assumption of ownership and control of Wyoming was to the advantage of Monolith because of the gypsum contract which Monolith had made 'through desperation' when it lost its prior source of supply and which was proftable to Wyoming. The decision to proceed no further with the Forgey contract was a detriment to Western as it was obligated under its performance bond. The facts justify the conclusion that Monolith was using Western and its property to the sole advantage of Monolith. That advantage was served by the abandonment of the Forgey contract.
 
 
 26
 Monolith emphasizes that there was no evidence of fraud but it is enough if the disregard of the corporate entity is required to prevent injustice. The issue was submitted to the jury under instructions, which, when taken as a whole and considered in their entirety, fairly and adequately set out the controlling principles. There was substantial evidence from which the jury could find that Monolith controlled and dominated Wyoming in the interests of Monolith and with full knowledge of the situation cause Wyoming to default on the Forgey contract with resulting detriment to Western. The verdict of the jury is sustained. It would be inequitable and unjust to permit Monolith to escape the consequences of its conduct.
 
 
 27
 Wyoming and Monolith say that the trial court erred in permitting the filing of the amended complaint which joined Monolith as a defendant. Amendments to pleadings are within the sound discretion of the trial court and should be granted freely as justice requires.[12] The impropriety of the allowance of amendment here is said to arise from the fact that any action against Monolith was barred by the applicable Wyoming statute of limitations. The theory is that the four-year statute covering non-contract, fraud and tort actions applies.[13] On written contracts Wyoming has a ten-year statute,[14] on oral contracts, either express or implied, an eight-year statute,[15] and on actions for relief not otherwise limited a ten-year statute.[16] The only statute which would operate to bar the action against Monolith is the four-year statute. That does not apply because the action is on a written contract and Monolith is liable under the instrumentality theory approved by the Supreme Court in the Taylor case.
 
 
 28
 Wyoming contends that the amended complaint should not have been permitted because Western had violated an earlier order in aid of discovery. The situations is that the trial court ordered Western to make more specific answers to certain interrogatories. Supplemental answers were made and there was no objection of lack of specificity. The point is without merit.
 
 
 29
 Error is predicated on the submission of two interrogatories to the jury in accordance with Rule 49(b), F.R.Civ.P. The court advised the parties well in advance that it would submit these interrogatories. No objection was made. The verdict was consistent with the answers to the interrogatories. By failure to object the parties have waived the right to protest now. In any event the interrogatories were fair and pertinent and did not prejudice the rights of any parties.
 
 
 30
 Various complaints are made against the instructions. A careful reading of the instructions convinces us that, considered as a whole, they fairly and adequately presented the issues and the controlling law to the jury. We find nothing therein which merits comment.
 
 
 31
 To the jury verdict assessing Western's damages at the sum of $74,677.33, the trial court added $25,701.45 as interest from January 23, 1953, the day when Western submitted to Wyoming an itemized statement of its expenses in completing the Big Sandy project. The award of interest is contested on the grounds that the amount due under the indemnity contract was unliquidated and that the court was without power to add interest to the verdict.
 
 
 32
 The contract was made and performed in Wyoming. This diversity action was brought in the United States Distrist Court for the District of Wyoming. The law of that state controls to determine the right to interest.[17]
 
 
 33
 The applicable Wyoming statute[18] allows 7% Interest on money due under a written instrument which does not specify the interest rate. Wyoming has held that under this statute interest may not be allowed on unliquidated claims.[19]
 
 
 34
 The itemized statement submitted by Western to Wyoming on January 23, 1953, showed the amount due to be $82,228.81. This was later reduced to $74,677.33 by adjustments favorable to Wyoming and secured through the diligence of Western.[20] These credits could have been obtained by Wyoming if it had then paid Western. The fact that the adjustments were made by Western does not convert the claim into one which was not liquidated. Wyoming was aided, not hurt, by the additional credits.
 
 
 35
 The attack by Wyoming on the necessity of certain expenses does not change the character of the claim. The fact that a claim is disputed does not preclude the recovery of interest.[21] The indemnity contract provided that the surety should be reimbursed for all expenses incurred in good faith whether necessary or not. Through an abundance of caution and without objection by any party, the trial court submitted to the jury the question of the necessity of the expenses,[22] and the jury returned a verdict for the exact amount which Western claimed. To permit a party to escape payment of interest by contesting the validity of a claim is to destroy the right to interest.[23]
 
 
 36
 In allowing interest the trial court acted on the authority of American Surety Co. of New York v. Carbon Timber Co., 8 Cir., 263 F. 295. This was a Wyoming case in which a surety on a timber contract sued for indemnity. The trial court denied interest and the court of appeals reversed saying that the amount was ascertained under and by virtue of specific authority of the indemnity contract and was a liquidated debt within the purview of the Wyoming statute. Wyoming and Monolith distinguish the American Surety Co. case on the ground that it was a trial to the court whereas here the trial was to a jury. The distinction is unimportant.
 
 
 37
 In Leet v. Joder, 75 Wyo. 225, 295 P.2d 733, 740, a denial of interest after jury verdict was upheld on the ground that in the circumstances of that case the right to interest was a question of fact for the jury rather than one of law for the court. After reviewing pertinent authorities, the court said that the power of a court to add interest to a verdict is based on the assumed failure of the jury to grant the plaintiff that to which he is entitled as a matter of law and that a court may not add interest when interest is a part of the damages or when it is impossible to ascertain whether the jury had included interest in the award on an unliquidated contract or claim.
 
 
 38
 This case does not come within either inhibition of the Leet decision. The jury was not instructed on the matter of interest.[24] The verdict was for the exact amount claimed due under the indemnity contract. There is nothing to suggest that interest was included in the amount of the verdict. Indeed, the record is entirely to the contrary. This was an action on a written contract and does not involve the portion of the Wyoming statute considered in the Leet case.[25] As in the American Surety case the right to interest followed as a matter of law and did not involve any question of fact.
 
 
 39
 Affirmed.
 
 
 
 [1]
 Wyoming brought in as third-party defendants Forgey Construction Company and Orrin B. Forgey, Russell Forgey, Chas. S. Chapin and W. J. McNamara, individually and as co-partners doing business as Forgey Brothers. The jury verdict was in favor of the third-party defendants. In this appeal the judgment in favor of the third-party defendants is not contested
 
 
 [2]
 The subcontract covered both 'blanket materials and riprap.' The operations are so connected that herein reference will be made only to riprap
 
 
 [3]
 In the Forgey-Wyoming contract it was provided that there might be no extension without the written consent of Forgey. The absence of such written consent may not be raised by Wyoming and it is not asserted by any other party. Neither Wyoming nor Forgey objected to the extensions and by their conduct acquiesced therein
 
 
 [4]
 Barnard-Curtiss Company v. United States, 10 Cir., 257 F.2d 565, 568 and authorities cited in note 10, certiorari denied 358 U.S. 906, 79 S.Ct. 230, 3 L.Ed.2d 227
 
 
 [5]
 Restatement of the Law, Security, 129(2), p. 346, states the rule to be that where the principal (Wyoming) and the creditor (Forgey) without the surety's consent agree to an extension, a compensated surety is discharged only to the extent that it is harmed by the extension
 
 
 [6]
 Wettlin v. Jones, 32 Wyo. 446, 234 P. 515, 517, 236 P. 247. Cf. R. H. Stearns Co. of Boston, Mass. v. United States, 291 U.S. 54, 61, 54 S.Ct. 325, 78 L.Ed. 647
 
 
 [7]
 See 72 C.J.S. Principal and Surety 133-134, pp. 622-627
 
 
 [8]
 Trinity Universal Insurance Company v. Gould, 10 Cir., 258 F.2d 883, 886
 
 
 [9]
 Ibid
 
 
 [10]
 Schoonover, the chief engineer of Monolith, testified: '* * * about 1950 or 1951, I don't recall the exact year when the U.S. gypsum plant at Laramie shut down and we were immediately forced to go out and find a source of gypsum. At that time Mr. Wheeler located a gypsum quarry for himself with the thought in mind of selling gypsum, so through desperation we bought gypsum from the Wyoming Construction Company.' It was not until 1953 or 1954 that Monolith located its own gypsum deposit
 
 
 [11]
 At the time of the stock assignment, the Wyoming stock had a book value of $98,000
 
 
 [12]
 Rule 15(a) F.R.Civ.P., 28 U.S.C.A.; Zeigler v. Akin, 10 Cir., 261 F.2d 88, 90
 
 
 [13]
 1945 Wyo.Comp.Stat. 3-506
 
 
 [14]
 Id. 3-504
 
 
 [15]
 Id. 3-505
 
 
 [16]
 Id. 3-509
 
 
 [17]
 T. & M. Transp. Co. v. S. W. Shattuck Chemical Co., 10 Cir., 158 F.2d 909, 910; North Drive-In Theatre Corporation v. Park-In Theatres, Inc., 10 Cir., 248 F.2d 232, 237
 
 
 [18]
 1945 Wyo.Comp.Stat. 39-1104
 
 
 [19]
 In re Johnson's Estate and Guardianship, 78 Wyo. 173, 320 P.2d 429, 433; Hancock v. Johnson, 69 Wyo. 503, 244 P.2d 285, 289; Dawson, Corbett and Shelp v. Lieurance & Canfield Const. Co., 68 Wyo. 465, 235 P.2d 457, 464-466
 
 
 [20]
 The most important credit resulted from the action of Western in securing remission of penalties by the Bureau
 
 
 [21]
 North Drive-in Theatre Corporation v. Park-In Theatres, Inc., supra, 248 F.2d at page 237; T. & M. Transp. Co. v. S.W. Shattuck Chemical Co., supra, 158 F.2d at page 911
 
 
 [22]
 The pertinent instruction was: 'Now, there are some items that are raised here as to whether an airplane was necessary in the completion of a job. There is other evidence that there was too much overtime paid, and I am sure that evidence is all clear in your mind. If you find for the Casualty Company then you shall take into consideration whether the $74,677 was the amount which they incurred in completing the job, less any expenses which you feel were unnecessary in the completion of the job.'
 
 
 [23]
 The language of the Supreme Court of Wyoming in Wyoming R. Co. v. Leiter, 25 Wyo. 286, 169 P. 1, 2, is appropriate and we quote: 'The argument amounts to this: That plaintiff could not pay because it did not know the amount due for the reason that it objected to the amount found due. A very handsome method of avoiding the payment of interest on one's debts.'
 
 
 [24]
 Neither party requested such an instruction
 
 
 [25]
 There reliance was placed on the provision allowing interest 'on money * * * due, and withheld by unreasonable delay of payment.'