### The WINSTON CORPORATION, Plaintiff,
### v.
### CONTINENTAL CASUALTY COMPANY, Defendant.
### Civ. No. 70-179.

United States District Court,
S. D. Ohio, E. D.

March 2, 1973.

On Motion for Reconsideration
June 20, 1973.

Dwight I. Hurd, Columbus, Ohio, for plaintiff.

John J. Petro, Columbus, Ohio, for defendant.

## OPINION AND ORDER

CARL B. RUBIN, District Judge.

The Winston Corporation, an Ohio corporation, brings this action against Continental Casualty Company, a company organized under the laws of Illinois, on a performance and payment bond is-

sued by Continental as surety for Diversified Engineering and Sales Corporation. The Court's diversity jurisdiction has been properly invoked under 28 U.S.C. § 1332 and the amount in controversy exceeds $10,000.00. The parties are in agreement that the law of Georgia will control the decision of this Court. This matter has now been submitted, following trial to the Court, on the evidence, exhibits, stipulations, and briefs of the parties.

This suit emerges from Winston's efforts to construct, between 1967 and 1969, the King's Inn Nursing Home in Atlanta, Georgia. While Winston and several of its principal officers had some experience in the construction field, primarily in residential housing, the decision to construct this nursing home represented a major and novel commitment of the corporation's resources. By the end of the summer of 1967, it had tentatively arranged for construction loans and commitments from banks in Atlanta, Georgia, and Rochester, New York. Bids were then let and three general contractors including Diversified Engineering and Sales Corporation of Atlanta, Georgia, bid on the project. The three bids came in at approximately $900,000.00 but after further negotiations, Winston entered into a contract with Diversified dated October 3, 1967, whereby Diversified agreed to build the nursing home for $752,874.00 in accordance with plans, specifications, and subcontracts attached to that document. The term of the contract provided for completion of the structure within three hundred (300) days from the time construction commenced.

As a further condition to the contract of October 3, 1967, Diversified agreed to supply a performance and payment bond for the benefit of Winston as obligee. This bond was executed on October 3, 1967, between Diversified, as principal, and Continental, as surety, and by its express terms incorporated the provisions and specifications of the contract of the same date.[1] Before it authorized the bonding of the nursing home project, Continental investigated the financial condition of Diversified and its principals, David W. Knight and Vance Dyer. This investigation revealed that while Diversified's assets, like those of many construction companies, were comparatively thin, its principal Knight appeared quite substantial and, on this basis, Continental accepted the risk of bonding the project.

Prior to the commencement of construction in January, 1968, Continental discovered that Knight was suffering financial ruin and would no longer be participating in the construction of the nursing home. Continental did not object in any form to Knight's withdrawal from the project and accepted Dyer as chief officer of Diversified in his place. It made no effort, however, to inform Winston of the data it had uncovered during its prebonding investigations, which revealed the less than solid financial condition of both Diversified and Dyer. Neither did Continental disclose to Winston that Diversified and Dyer had submitted financial reports which overstated their actual net worth. Continental did not, at any time, suggest that Knight's departure from the project altered their obligations under the bond of October 3, 1967.

Construction work on the nursing home finally commenced in January of 1968 and proceeded disastrously almost

---

1. The obligations of Continental under the bond of October 3, 1967, were as follows:
"  .  .  .  [I]f the above  .  .  . principal [Diversified] shall well and faithfully perform the things agreed .  .  . to be performed, according to the terms, conditions, and requirements of the foregoing contract; and shall pay all persons who have furnished labor or material for use in or about the improvement; and shall indemnify and save harmless the obligee [Winston] .  .  . from any and all claims for damages, costs, judgments, and other expenses, arising or growing out of this contract; then, this obligation [in the amount of $752,874.00] shall be null and void, otherwise, the same shall remain in full force and effect."

from the outset. Under pressure from the municipal authorities, Diversified found it necessary to move the entire site of the project ten feet from where it had expected to build it; and problems having to do with the foundation of the nursing home were also encountered. By the late spring and summer of 1968, it became obvious to everyone connected with the project that construction of the nursing home had fallen hopelessly behind schedule. Despite increased exhortations from Winston and its agents, Diversified was unable to maintain a construction pace reasonably calculated to yield a completed structure at the expiration of the 300-day term. In August, 1968, for example, 70% of the term had elapsed but the structure was only 28% completed. A new certifying architect was brought in at that time in an effort to impose firmer control on the course of the construction.

By the summer of 1968 it had also become obvious to all interested observers that there was little correlation between the percentage of completed structure and the percentage of depleted construction funds. In the middle of September, 1968, for example, approximately one-third of the building was completed but approximately one-half of the contract price had been expended for that portion of the construction.

Continental followed developments at the construction site closely and its agents prepared a continuous stream of memoranda about the position the company should take were a claim filed under the bond. Some of Continental's agents were of the opinion that the bond was not in legal force because of Winston's alleged failures to abide by Article 8.3 of the contract; others argued in memos to the home office that Continental was discharged from its obligations because of a change made in the manner of disbursements in January, 1968, by the lending bank in Atlanta. There is no evidence, however, that Continental firmly decided on a legal course of action prior to the time that a claim was actually made upon the bond in December, 1969.

The 300-day term of the contract expired by November, 1968. Winston, in an effort to clarify its exposure, called for a meeting of the three parties to the surety contract in January, 1969. The company was concerned, as its deadline for closing the permanent loan was April 1, 1969, and because it had already entered into a lease with River City Corporation for the completed nursing home. Continental declined to attend this meeting, indicating somewhat cryptically that it would proceed in accordance with its obligations under the bond. The surety refused, however, to give Winston any opinion on the effect further delay in the construction of the nursing home would have on the continued validity of the bond.

Events reached their climax in April, 1969, with Winston bringing things to a head. It requested a meeting among the three parties in Atlanta, but Continental refused to attend. After negotiations on April 3, 1969, Winston decided to terminate, pursuant to Article 22 of the General Conditions of the Contract,[2] Diversified's participation in the construction of the nursing home. Diversified reacted to this move by threatening le-

---

2. Article 22 of the Contract provides in material part as follows:

"*Owner's Right to Terminate Contract*—If the Contractor should be adjudged a bankrupt, . . . or if he should fail to make prompt payment to subcontractors or for material or labor, or persistently disregards laws, ordinances or the instructions of the Architect, or otherwise be guilty of a substantial violation of any provision of the Contract, then the owner, upon the certificate of the Architect that sufficient cause exists to justify such action, may, without prejudice to any other right or remedy and after giving the Contractor, and his surety, if any, seven days written notice, terminate the employment of the Contractor and take possession of the premises and of all materials, tools and appliances thereon and finish the work by whatever method he may deem expedient . . . ."

gal action and after further negotiations the parties entered into an agreement dated April 7, 1969. By its terms Diversified was relieved of further responsibility towards the construction of the King's Inn Nursing Home. All of its contracts with the project's subcontractors were assigned to Winston, which took over day by day responsibility for the construction. While the documents drafted by Winston and Diversified do not directly state that the contractor was in default under the contract, the agreement of April 7th constituted the functional equivalent of a declaration of default. Although Winston vigorously denied that this was the intent of the parties, the effect of these negotiations leads inescapably to our present conclusion. It is undisputed that Continental was not given the seven days written notice of plaintiff's intent to default Diversified as was required by Article 22.

With Winston in direct charge of the project, things began to proceed more smoothly. An extension of the bank loans was negotiated and while the original lease for the nursing home was terminated, a new one, albeit at less favorable terms, was entered into. Under Winston's control the nursing home project was completed on October 24, 1969, at a total cost of $1,018,000.00. After Continental refused, in December, 1969, to recognize any liability under the bond, Winston brought the present action to recover actual damages in the amount of approximately $619,000.00 plus interest. This amount represents the additional construction costs over and above the contract price; increased interest on the extension of the permanent loan and the construction loan; and the loss of rental income due to Winston's inability to perform on its lease with River City Corporation. In addition, Winston is seeking to recover punitive damages against Continental for its alleged failure to comply in good faith with the terms of the bond and for the surety's failure to make financial information concerning Diversified available to Winston.

On the state of facts as set forth above, this Court is of the opinion that judgment must be entered in favor of the surety. Our holding is based on two primary grounds: that the agreement entered into between Winston and Diversified on April 7, 1969 constituted a novation of the original contract which, under principles of Georgia law, discharged the surety; and on the further ground that Winston failed to abide by the notice provisions of Article 22 of the Contract, see n. 2 *supra*. We believe that certain other contentions advanced by the parties are without legal merit.[3]

3. For example, the contract between Winston and Diversified contained a provision which required the consummation of financing arrangements within sixty (60) days from the signing of the contract and provided for notice of this fact to Diversified. This was set out in Article 8.3 of that document, which further provided that:

This contract is conditioned upon the consummation of the loan financing of construction cost by the owner with The Fulton National Bank of Atlanta and the consummation of the permanent financing by the owner with First Federal Savings and Loan Association of Rochester, New York, and upon the consummation of said financing the owner will notify the contractor by letter addressed to the contractor at 3390 Peachtree Road, N. E. Suite 1544 by registered mail and upon receipt of said letter this condition shall be satisfied and no longer effective but in the event the said letter is not received by the contractor within sixty (60) days from date, this contract shall become null and void.

In fact, permanent financing was not solidified until late December, 1967, beyond the 60-day provision of that Article 8.3.

Continental, the surety herein, argues that this delay beyond the term specified in Article 8.3 resulted in the voiding of the entire contract. We note, however, that while this particular term of the contract was not followed, neither Winston, Diversified, nor Continental raised any objection at the time this alleged breach occurred, or sought then to invalidate the entire contract. A bond preimum, in the sum of $6,444.00 was paid to Continental's agent on or about January 26, 1968, beyond the 60-day term, and all parties pro-

These legal conclusions will be discussed in more detail below.

In the past many Georgia courts followed the rule that a compensated surety was not a favorite of the law and had to show that a novation was detrimental to it before being entitled to a discharge. *See* Peachtree Roxboro Corp. v. United States Casualty Co., 101 Ga.App. 340, 114 S.E.2d 49, 53 (1960); also see United States v. Algernon Blair, Inc., 329 F. Supp. 1360 (D.S.C. 1971) (under Georgia and South Carolina law). This rule is similar to the view taken by the Restatement, see Restatement of Security, Sec. 128(b) and by the courts of Ohio, see Indemnity Co. v. Granite Co., 100 Ohio St. 373, 126 N.E. 405 (1919); American Guaranty Co. v. Cliff Wood Coal & Supply Co., 115 Ohio St. 524, 155 N.E. 127 (1926); Carter v. Bernard, 269 N.E.2d 139 (C. P. Montgomery Cty. 1971).

■ The present majority rule in Georgia, however, is now to the contrary. The controlling case law in that state, now codified in the Georgia Code, provides that "any change in the terms of the contract is considered a novation and discharges the surety in the absence of the latter's consent. The surety is also discharged by any act of the creditor which injures him or increases his risk. Ga.Code §§ 103–202, 103–203."[4] Brunswick Nursing & Convalescent Center, Inc. v. Great American Insurance Co., 308 F.Supp. 297 (S.D.Ga.1970). Under this view a surety need not show that he was injured by the novation. Alropa Corp. v. Snyder, 182 Ga. 305, 185 S.E. 352 (1936), a novation for these purposes being defined as "a change in the nature and terms of the contract." American Surety Company of New York v. Garber, 114 Ga.App. 532, 151 S.E.2d 887 (1966).

■ Under these principles, it is plain that the April 7th revision of the contract constituted a novation within the meaning of Georgia law. Diversified's role in the construction of King's Inn was effectively ended by this novation and Winston entered, for the first time, into direct contractual relationships with the project's subcontractors. The contract of April 7th, therefore, has little relationship to the contract between Winston and Diversified as originally bonded by Continental. It cannot be maintained, as plaintiff attempts to do, that these changes were not material alterations or that they were permitted by the "addendums, modifications and amendments" clause of the bond. On the contrary, the agreement of April 7th entirely changed the operative legal relationships of the three parties to the surety contract by the elimination of one of them. Since these alterations of the contract were made without the approval of the surety and are novations under Georgia law, Continental must be discharged from its obligations under the bond. *See* Lowndes Alliance Warehouse Co. v. Greene, 17 Ga.App. 542, 87 S.E. 826 (1916); Palmes v. Southern Mechanical Company, 117 Ga.App. 672, 161 S.E.2d 413 (1968).

In addition, it is unmistakable that Winston failed to comply with the default provisions as set forth in Article 22 of the contract. The surety bond between Continental and Diversified incorporated the provisions of Article 22

---

ceeded thereafter in accordance with the other terms of the contract. These acts of the surety constitute a legal waiver of the term provision of Article 8.3 of the contract, and we therefore do not think that this contention of Continental's is well taken.

4. Sections 103–202 and 103–203 of the Georgia Code Annotated, which are the bases of the holding in the *Brunswick* case, provide, in material parts, as follows:

Section 103–202—"[a]ny change in the nature or terms of a contract is called a novation; such novation, without the consent of the surety, discharges him.

Section 103–203—"[a]ny act of the creditor . . . which injures the surety or increases his risk, or exposes him to a greater liability, shall discharge him . . ."

which, by its express terms, provided that the surety was entitled to seven days written notice prior to a declaration of default.

It is conceded that this notice was never given to the surety. Winston did, of course, consider Diversified to be in legal default of the contract and its actions of April 7th must be interpreted as a functional declaration of the contractor's actual status.

■ Winston may have had excellent reasons for not complying literally with the default provisions of its contract. Such a declaration of default may well have added additional costs to the already swollen construction budget and jeopardized Winston's permanent financing. In a time of rising interest rates and tighter money markets its failure to abide by the provisions of Article 22 may have made good economic sense. See Record at 211. We do not believe, however, that a party to a contract can pick and choose among its provisions, following those which inure to his benefit and ignoring those which might cause him detriment. On the contrary, a party either chooses to honor a contract or for tactical reasons decides to proceed without its protection.

It is not entirely clear how timely notice pursuant to Article 22 would have advantaged the surety. However, it is conceivable that had Winston, in April, 1969, placed Diversified in default in a manner consistent with Article 22, Continental might have negotiated a settlement of its liability or the surety could have taken steps to decrease, or fix or mitigate its duties under the bond. It is, of course, possible that Continental would have denied any responsibility to Winston on the grounds that the project was not commenced in a timely manner or that the term of the bond had expired or for any other reason.[5] The Court has no way of knowing what the surety's public legal response, as distinct from the private suggestions of its servants, would have been had Winston properly declared the contract in default. Since Winston declined to assume the immediate economic risks inherent in declaring default, pursuant to Article 22, it failed to properly shift Diversified's contractual obligations to the surety.

Nor do we agree with Winston's contentions that a declaration of default would have increased its risks unreasonably. Even if the surety had, following proper notice of default, formally denied liability under the bond, Winston had the right, by the plain terms of Article 22, to take control of the construction site and the contractor's equipment within seven days of that notice. The principle of mitigation may well have required, and would certainly not have prevented Winston from proceeding as it in fact did under the contract of April 7th. If the surety had refused to negotiate on the grounds that it had been discharged by earlier acts of either Winston or Diversified, the plaintiff's equitable and legal standing, in regard to subsequent litigation, would have remained unsullied.

■ Even if we were to assume, *arguendo*, that timely notice of default would not have been beneficial to the surety, Winston was bound by its contractual obligations to give it in any event. It cannot be exonerated for not having done so on the ground that strict compliance with its contractual obligations may have resulted in economic in-

5. We note as to the issue of term that Continental agreed to bond a construction project which was to be completed in three hundred days. In fact, the nursing home took in excess of six hundred days to complete, or more than double the specified term of the bond. Continental does not argue that the term provisions of the bond of a compensated surety are absolute. See Restatement of Security, Sec. 129(2).

It is, however, possible that Winston may have waived its rights under the bond by failing to declare default within a reasonable time after it became obvious that Diversified would be unable to satisfy its obligations under the construction contract. In light of the facts of the present case, it is not necessary that the Court reach and resolve this question of law.

jury. Winston elected not to proceed on its contract and will not now be heard to say that that same contract now affords it a remedy.

■ Under Georgia law, a "contract of suretyship must be strictly construed in the interest of the surety." Peara v. Atlanta Newspapers, Inc., 120 Ga.App. 163, 169 S.E.2d 670 (1969); also see Glasser v. Decatur Lumber & Supply Company, 95 Ga.App. 665, 99 S.E.2d 330 (1950); Maryland Casualty Co. v. Mc-Alpin, 31 Ga.App. 303, 120 S.E. 644 (1923). The courts of that state have further noted that: "[T]he undertaking of a surety beng stricti-juris, he cannot in law or equity, be bound further than by the very terms of his contract." Bethune v. Dozier, 10 Ga. 235 (1851); Mayor of Savannah v. Glen Falls Insurance Co., 104 Ga.App. 879, 123 S.E.2d 293 (1961); also see Peara v. Atlanta Newspapers, Inc., *supra* at 671; Glen Falls Insurance Co. v. Wright Contracting Co., 276 F.Supp. 122, 131 (D.Md. 1965) (under Maryland law.) [6] For all of the foregoing reasons the Court does not believe that Winston's claims under the bond are meritorious.

Winston also asserts as a basis for recovery against the defendant, in addition to its claim on the bond, a common law theory in both contract and tort. It argues that Continental's acts, which included a failure to disclose information regarding Diversified's financial status and a refusal to reveal in advance of claim several potential defenses to the bond, constituted a violation of the duty of good faith owing from a surety to its obligee. Plaintiff places primary reliance for these contentions in the doctrine of Trinity Universal Insurance

Company v. Gould, 258 F.2d 883 (C.A. 10 1958) (under Kansas law.).

■ We do not believe that *Trinity* can be reconciled with accepted principles of Georgia surety law. As we have noted above, contracts of surety in Georgia must be ". . . strictly construed in the interest of the surety." Peara v. Atlanta Newspapers, *supra*. A duty of good faith may well be imposed upon any party to a surety contract but it cannot extend to relieve the obligee of duties and responsibilities which properly repose in him. Strict compliance with the provisions of Article 22 by Winston was a condition precedent to Continental's liabilities, if any, under the bond. There is no way of ascertaining whether the surety would have met its duty of good faith under the bond, informal memos of its agents notwithstanding, as the condition precedent to that duty was never properly discharged.

■ Nor does this Court believe that any obligation devolved upon Continental to inform Winston of Diversified's economic straits. This information was ascertainable upon reasonable investigation and soon after construction began it was obvious to both the surety and the obligee that Diversified was incapable of proceeding in an acceptable manner under the contract. In the usual course, the converse of the position urged by plaintiff upon the Court is true. Since the obligee contracts initially with the principal, it often does so following an investigation. In the course of that investigation it may discover information regarding the principal which tends to affect the surety's risk and which is kept from the surety's attention. In these situations the general rule and the

6. The plaintiff argues that under the holding of Peachtree Roxboro Corp. v. United States Casualty Co., *supra*, it was under no absolute requirement to give notice of Diversified's default to the surety. This is certainly true as far as it goes but we do not believe the *Peachtree* principle is controlling in the instant case. The bond under litigation in *Peachtree*, unlike the one at bar, did not require ". . . notice of any default to be given by the plaintiff." Peachtree Roxboro v. United States Casualty Co., *supra* at 53. The case law of Georgia clearly establishes that there is no absolute duty to give the surety notice of a major default by the contractor absent a contractual obligation to do so. We note, only in passing, that this view is not inconsistent with the view prevailing in this Circuit. See United States v. Ohio Casualty Insurance Co., 399 F.2d 387 (C.A.6 1968).

one in force in this Circuit is that the obligee is under no duty to disclose this information. See United States v. Ohio Casualty Insurance Co., *supra* at 389; Magee v. Manhattan Life Insurance Co., 92 U.S. 93, 23 L.Ed. 699 (1876). We can perceive no reason why a different rule should be imposed where the surety possesses information accessible to, and indirectly known by, the obligee. Once Winston knew that Diversified, for whatever reason, would be unable to meet the requirement of the contract, it had the option of placing the principal in default but it failed to exercise this right. Plaintiff's ultimate harm was not, therefore, a consequence of Continental's failure to disclose.

Several other issues have been advanced and briefed by the parties, but finding as we have above, it becomes unnecessary to reach these.

The foregoing shall constitute our findings of fact and conclusions of law as required by Rule 52, Fed.R.Civ.P.

Accordingly, on the basis of the evidence and for the reasons and authorities as set forth above, judgment shall be entered in favor of defendant Continental Casualty Company and against plaintiff Winston Corporation.

It is so ordered.

## ON MOTION FOR RECONSIDERATION

This matter comes before the Court on plaintiff Winston Corporation's motion, pursuant to Rule 59(e), Fed.R.Civ. P., for a reconsideration of our Opinion and Order of March 2, 1973, as finalized by Judgment March 13, 1973.

In our view the factual and legal issues presented in this case were fully discussed and resolved by our earlier Order and will not be repeated here. It must be kept in mind that in this diversity action, under applicable principles of conflict of laws, we sit as a Georgia court, applying the law of Georgia as it would be applied by a judge of that state. This we have tried to do and the conclusions of our legal research are set forth in our Opinion of March 2, 1973.

Under these circumstances we would deem it inappropriate to attempt to graft the perhaps more enlightened or liberalized views of other jurisdictions, see, for example, Trinity Universal Insurance Company v. Gould, 258 F.2d 883 (C.A.10 1958) upon what we deem to represent settled principles of the jurisprudence of Georgia. As we noted in our earlier Opinion, a different result may well have obtained under Ohio surety law. See *Id.*, at 1028 (slip opinion). Had the parties at the time they negotiated their contract included a "forum-selection" clause, wherein it was provided that the law of Ohio or some other state, would govern the resolution of any disputes under the contract, this Court would have, in all likelihood, honored such a provision. See M/S Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 92 S. Ct. 1907, 32 L.Ed.2d 513 (1972). Since the parties failed to do this, the strict Georgia law of suretyship, which makes relatively little differentiation between compensated and uncompensated sureties, is a bar to plaintiff's recovery.

Nor do we think it appropriate to write what may be our own personal views of what is correct upon the surety law of Georgia. A functioning system of law, as contrasted with one of men, at times demands that the personal beliefs or caprices of individual judges be subordinated to established principles of law. If the surety law of Georgia is out of joint, surely it is for the legislature and the judges of that state, who have continuous contacts with the purported problems, and not for this Court, whose contract is fortuitous, to set it right.

Accordingly, plaintiff's motion for reconsideration is without merit and the same is hereby Denied. The judgment of March 13, 1973 is, therefore, Reinstated.

It is so Ordered.