**GLENS FALLS INSURANCE COM-
PANY, a corporation,**

v.

**WRIGHT CONTRACTING COMPANY**
and
**Delta Coastal Corporation.**

Civ. No. 15431.

United States District Court
D. Maryland.

Oct. 5, 1965.

Wright Contracting Company (Wright), a principal contractor on a Maryland State Roads Commission project, (2) Delta Coastal Corporation (Delta), with which Wright entered into a subcontract, and (3) Glens Falls Insurance Company (Glens Falls), Delta's surety. Glens Falls' principal contention is that it was released from liability under its bond because the contract relationship between Wright and Delta, upon which its bond was based was changed without its knowledge or consent to an arrangement by which the officers and employees of Delta became in effect employees of Wright.

The parties have agreed that all questions of liability shall be determined at this time by the Court without a jury, leaving for future hearing and determination the amount of damages which may be awarded under the decision now being made.

### Issues

The basic issue is whether Wright and Delta abandoned the written contract, which provided that Delta should be a subcontractor, and proceeded under a modified arrangement which made the officers and employees of Delta in fact employees of Wright, subject to Wright's direct control.

If there was such a change in the arrangement:

A–1. Did it release Glens Falls from liability under its surety bond (a) on ordinary principles of the law of suretyship, or (b) on grounds of illegality or public policy, in that the matter was handled by Wright in such a manner as to evade a rule of the Commission?

A–2. What were the respective rights and obligations of Wright and Delta under the new arrangement? Was either of them guilty of a breach which imposed on it a legal liability to the other? Does Delta have a claim against Wright on a quantum meruit or other basis?

If there was no such change in the arrangement:

B–1. Was Delta guilty of such a breach as justified Wright in terminating

William B. Kempton, Baltimore, Md., and Edward Gallagher, Washington, D. C., for Glens Falls.

Charles C. Hartman, Jr., Annapolis, Md., and Tom B. Slade, Columbus, Ga., for Wright Contracting Co.

E. Harold Patterson, Bethesda, Md., and Branko Stupar, Washington, D. C., for Delta Coastal Corp.

THOMSEN, Chief Judge.

This action involves claims, counterclaims and cross claims between (1)

the contract? If so, is Wright entitled to recover from Glens Falls and Delta under the bond, or to recover damages from Delta on some other theory?

B-2. Was Wright guilty of a breach of the contract, making it liable in damages to Delta?

### Facts

The determination of the facts has been made difficult because many of the witnesses who testified in the case were not fully credible, for one reason or another,[1] the testimony of other witnesses has to be scrutinized very carefully to determine whether their inferences and stated conclusions are based upon established facts, and some important original records of all three parties either had been destroyed or were not produced.

The findings of fact set out below are based upon a careful weighing of the conflicting testimony and the documentary evidence.

Wright is a general contractor engaged in highway construction, with its home office in Columbus, Georgia, and a regional office in Odenton, Maryland. Its officers and principal employees involved in this case are experienced, shrewd and ruthless.

On or about September 26, 1962, Wright entered into a contract with the Maryland State Roads Commission for the construction of 1.30 miles of the Cabin John Parkway, Montgomery County, Maryland, consisting of a dual section of road, bridges, culverts and walls, for a total price of $1,499,901.40, the work to be completed in 290 working days.

Wright began work on its contract in the autumn of 1962 and subcontracted portions of the work to several subcontractors not involved in this case, all of whom were pre-qualified with the Commission in accordance with the requirements of sec. 10.03–2 of the State Roads Commission Specifications for 1962.

Two of the bridges covered by Wright's contract, B–6 and B–7, which were of box girder design,[2] crossed Cabin John Creek, B–6 carrying the southbound lane and B–7 the northbound lane. B–6 was located under a much longer bridge, which carried the George Washington Memorial Parkway east along the Potomac River. That bridge was being built by Blackwell Construction Co., another principal contractor. By February, 1963, Wright had already ordered the structural steel, some concrete and other material for B–6 and B–7, but work on those bridges was being delayed by Blackwell. Their construction presented difficult problems both with regard to the substructures (which included some tall, thin, concrete piers) and the superstructure (because of the unusual box girder design). An employee of Wright got in touch with Robert Massey to see if he was willing to undertake the construction of B–6 and B–7.

Robert Massey and his brother Howard were capable and experienced bridge builders but were poor businessmen. They were the principals in J. R. Massey & Sons, Inc., a corporation which employed union labor, but they had decided to organize another corporation, defendant Delta, which was incorporated on March 1, 1963, to engage in non-union operations. The Masseys were willing to have Delta undertake the work for $225,975, which was $10,000 less than Wright had allocated to that portion of the work in its estimate. Delta, however, needed financing, and Wright agreed to finance Delta's payrolls, as well as to advance the money to pay for the material which Wright had already ordered. That agreement was reached on February 20, 1963, when Robert Massey, president-to-be of Delta, and his attorney Farrell went to Wright's Odenton office. Later that afternoon an employee of Wright filled out a printed subcontract form, which was dated February 20, and prepared a

---

1. One of Wright's most important witnesses, Gillis, changed his explanation of several embarrassing facts, one three times, one twice and one once.

2. I.e., the spans were to be constructed of reinforced concrete rather than steel.

supplemental letter agreement dated February 21, both of which were signed on behalf of Wright and sent to Massey on February 21, with a covering letter.

The subcontract form referred to the principal contract indicating the items which were covered by the subcontract, some of which were lump sum items and some unit price items. It called for completion of the work by January 1, 1964, with liquidated damages of $165 a day thereafter. It required Delta to carry certain insurance and to furnish a performance and payment bond. It did not refer to the letter agreement.[3]

The letter agreement provided that Wright was to furnish and pay for specified materials at the prices stipulated "to be incorporated by you as subcontractor" into the work covered by the principal contract, "charging to your account and deducting from any and all sums due you for estimates earned". There followed a list of the materials to be supplied by Wright, with their estimated quantities, units and prices. The materials listed were "bearing assemblies", "reinforcing steel", "Class A concrete" and "Class C concrete". The letter agreement continued: "It is further agreed that we will pay the payrolls and all applicable insurance and taxes on your employees used on the above project, charging to your account and deducting from any and all sums due for estimates earned." The letter agreement did not indicate that Delta's officers and employees should be-

come, in effect, members of the Wright organization.

The evidence is conflicting as to why the entire agreement was not included in one document. The Court finds that a major reason, if not the only reason, why separate documents were prepared was because Wright wished to treat the agreement as a subcontract so far as obtaining a surety bond from Delta was concerned but did not intend to report it as a subcontract to the State Roads Commission.

A rule of the Commission, embodied in sec. 10.08–1 of the 1962 Specifications, which are a part of the principal contract between the Commission and Wright, provided in pertinent part:

"The Contractor to whom a contract is awarded shall perform with his own organization and with the assistance of workmen under his immediate supervision, work of a value of not less than 50 per cent of the total original value of the contract.

"If any Bidder shall state in his proposal the particular contract item(s) he proposes to sublet, and shall name therein the qualified sub-contractors to whom he proposes to sublet such stated work, such item(s) of work may be performed by such named subcontractors, up to a total of 50 per cent of the total original value of the contract.

"No portion of the contract shall be sublet, assigned, or otherwise disposed

---

3. The subcontract stated: "Anchor bolts for steel handrails will be furnished by contractor and installed by subcontractor." It further provided that the following paragraph in the subcontract form should not apply:

"19. In any case where Contractor is required to furnish any labor, materials, equipment or other items which Subcontractor is obligated to furnish, or to perform any work which Subcontractor is obligated to perform, whether such be done by Contractor in the exercise of an option herein provided or otherwise, and whether or not provision is herein made for Contractor's reimbursement or recovery, Contractor shall be entitled to recover from Subcontractor, in addition to the

cost actually incurred, ten per cent of said cost for Contractor's overhead and an additional ten per cent profit." The subcontract form also contained the following provisions, inter alia:

"26. The refusal or denial of any consent or approval required by the Principal Contract to be obtained from Owner or Owner's representative, with respect to the sub-letting of the work herein embraced or the selection of Subcontractor to perform same, shall nullify and void this agreement."

"30. The entire agreement between Contractor and Subcontractor is set forth herein, and there are no understandings or agreements between them concerning said work other than those herein expressed."

of except with the written consent of the Commission and of the Surety. The sub-contractors who are named in the proposal form and approved by the Commission, and those approved when subsequently submitted, shall perform the contract items as approved by the Commission. Requests for permission to sublet, assign, or otherwise dispose of any portion of the contract shall be in writing. * * * "

In practice, some prime contractors sought to avoid or evade this rule by placing the employees of one or more subcontractors on the payroll of the principal contractor. This Court finds as a fact from the conflicting evidence that the Commission knew of the practice and considered it not improper, provided the principal contractor exercised full control over the work of the men placed on its payroll. Under such circumstances, the 50% rule would not apply because the Commission considered that such a contractor would be performing the work with his own organization; so far as the Commission was concerned, there would be no subcontract involved. If, however, the circumstances were such that the principal contractor could not properly be considered as performing the work with his own organization, the 50% rule would apply and it would be necessary to prequalify the subcontractor. Reporting Delta as a subcontractor would have carried the percentage of work subcontracted near the 50% mark, and Wright did not wish to handicap its ability to subcontract additional items in the future.[4]

The printed subcontract was executed by Delta and returned to Wright before April 20, 1963, when the Glens Falls bond was executed and Delta began to work. Delta's acceptance of the letter agreement was dated April 20, but it was not returned to Wright until about May 1,

because Delta's attorney was disturbed by some of its language.

Delta had experienced trouble getting a bond, and Wright, with the approval of Massey, suggested that one of the Wright employees get in touch with Herman Stump of Stump, Harvey & Company, insurance agents and brokers in Baltimore, to see if he could secure a bond. Stump was not Wright's regular insurance broker, but had written some policies for Wright and was anxious to get more of Wright's business. Stump was an agent for Glens Falls so far as its casualty business was concerned, but had no authority to write surety bonds for that company. Stump took the matter up with the Glens Falls underwriter, who agreed to write the bond guaranteeing the obligations of Delta under the subcontract. The bond contained the usual provision that no change in the subcontract should affect the surety's obligation, but the surety did not waive notice of default. The bond was sent to Wright by Stump on April 22, 1963. The underwriter did not ask for or see a copy of the subcontract, but Glens Falls knew or was charged with knowledge of the terms of the printed subcontract and of the supplemental letter agreement. Glens Falls did not know until October, 1963, how the matter was actually being handled by Wright and is not charged with such knowledge until that time.

In fact, from the beginning of Delta's work, Wright treated Delta's officers and employees as part of Wright's organization and did not treat Delta as a subcontractor. All of the employees of Delta were put on the Wright payroll and Wright paid their wages, social security, etc., and carried them as Wright employees under its workmen's compensation policy. Howard Massey was carried on Wright's payroll as a superintendent at $175 per week during the period he was on the job, and was paid $145.-

4. Thirty-three percent of the work under Wright's contract had already been subcontracted by February, 1963. In June and July of 1963 Wright did subcontract additional items to other subcontractors, which carried the total to 44%, and would have carried it over 50% if Delta had been treated and reported as a subcontractor.

82 a week net by Wright. Robert Massey was carried part of the time as a foreman and part of the time as a superintendent, and was paid a wage by Wright which apparently varied depending upon whether Howard Massey was on the job. Massey was not given written change orders and other orders by Wright's project foreman, as a subcontractor would ordinarily expect, but was given oral orders. A fore-man named Rasnik was engaged by Wright to do a part of Delta's work on a bonus basis before Wright terminated Delta's contract, and other Wright foremen also did part of the work. Wright's superintendent was paid a bonus calculated on that portion of Wright's principal contract which was not subcontracted. The amount of the Delta subcontract was not deducted although the amounts of the other subcontracts were; the Delta work was included in the bonus arrangement the same as other work which Wright handled itself.

Wright required Delta to order, usually from Wright's suppliers, in the name of Wright, to the attention of one of the Masseys, material and supplies not covered by the letter agreement, as well as the materials listed therein. The purpose of this instruction was to prevent the representatives of the Commission from learning that Wright had entered into a subcontract agreement with Delta. On occasion, Wright's employees even went so far as to deny any knowledge of Delta when employees of the Commission were present.[5] This arrangement made it difficult for the Masseys to know exactly how much was owed for such materials and supplies at a particular time, since the statements which Wright furnished Delta were not always accurate and sometimes charged Delta with items which were not then due. Wright carried in its own name alone insurance on the material, lumber, etc. which Delta brought onto the job, collected insurance thereon when they were damaged by a flood in August, and kept the money.

The Masseys had sufficient men and equipment on the site, or available, to carry on the job with reasonable promptness if they had not been delayed by conditions beyond their control.[6] The construction of B–6 and B–7, as well as the construction of other portions of Wright's work, was seriously delayed by the work of Blackwell, which was building the long bridge over B–6. Although Blackwell's work was supposed to have been completed by April, 1963, it was not in fact completed until November. Wright's employees testified that Blackwell had not delayed Delta appreciably or at all. However, on October 29, 1963, shortly after Wright had terminated Delta's contract, Wright wrote the State Roads Commission that conditions in "the immediate area of Structure B–6 and B–7 for approximately two months" had caused "both delay and added expense by not having working room necessary for proper execution of the operation".[7]

5. In midsummer, one of the Wright employes objected to the Masseys' charging certain minor supplies to Wright, but the general practice was to require the Masseys to purchase all material and supplies from Wright's suppliers in the name of Wright.

6. At one time, after the work had been delayed by conditions beyond the Masseys' control, difficulty was experienced both by the Masseys and by Wright in obtaining non-union carpenters. Wright was not willing to permit the Masseys to bring union carpenters onto the job.

7. The letter of October 29, 1963, read as follows:

"As of this writing, Blackwell Construction Company who is building the bridge over Cabin John Creek (BPR Proj. No. 100–A2 GWMP) has a backhoe working directly between the West Abutment and Pier # 1, Structure B–6 on our project. This results in our not being able to erect the falsework for the docks as we had planned and started Monday, October 28, 1963. We have talked to the BPR Engineer on Blackwell's job and he cannot seem to give us a date as to when they will be out of the area.

"You may note that the paragraph headed COORDINATION OF WORK on page two of the Special Provisions advises that there will be other contractors in the area, and we were also advised at the pre-bid meeting that Blackwell would be out by April 1, 1963. As

Wright itself delayed the Masseys in a number of ways. Wright required the Masseys to obtain their concrete from Wright's supplier, and Wright frequently insisted upon taking its requirements from the first deliveries each day, forcing the Masseys to wait until later deliveries and seriously delaying the Masseys' work. There were delays in delivering the steel which Wright had undertaken to supply. The Masseys were delayed for 30 days at least by the flooding of Cabin John Creek on August 19 and again on August 29, which destroyed or damaged their concrete forms and washed away lumber and a pump, which had to be recovered and cleaned.

In April, 1964, and again in December, 1964, Wright wrote to the Commission, stating that the progress of its work had been seriously interfered with throughout by Blackwell, and asked for and obtained a sufficient extension of time by reason of the Blackwell interference and the flood to eliminate any claim by the Commission for liquidated damages against Wright.

Other, less spectacular causes of delay were unexpected quantities of rock which had to be blasted before certain footings could be installed, relocation of some of the footings, requiring extra excavation, changes in the location of the access road and trouble with a sewer north of B–7. The Masseys also had difficulties with a large crane furnished by Wright for their use, which was not suitable for the work at hand.

Wright was continually complaining because Delta's progress did not show earnings under the subcontract equal to the amounts which Wright had advanced. In some instances Wright's figures were inflated by front-charging certain items which were not fairly chargeable against

Delta at that time. The Masseys had been required by Wright to order from Wright's suppliers certain items which they would normally have obtained from their own materialmen, with whom they had an established credit, and Wright attempted to use the relatively small amounts due Wright's suppliers for materials so ordered as a breach of contract by Delta and grounds for terminating the arrangement. Since Wright charged Delta with materials purchased by Wright, including the supplies ordered by Delta in the name of Wright, there was never any money due Wright under the terms of the subcontract, if treated as a real subcontract, since the amounts earned in the early stages of such contracts are always less than the costs.

On July 17, Wright wrote Glens Falls that Delta had breached its contract by failing to pay four small bills totaling $5,567. In fact, under the procedure required by Wright, the Masseys could not be sure exactly how much of the material had been used on B–6 and B–7 and how much was due for some of the items at the time.

The only termination clause in the subcontract reads as follows:

"9. If at any time, in the opinion of Contractor, the labor or materials or any other item which Subcontractor is obligated to furnish hereunder is deemed insufficient or inadequate, either in quantity or quality, to properly prosecute the work with promptness and diligence, or if Subcontractor shall fail at any time to comply strictly with the terms of this agreement or any change order issued as herein provided, and such insufficiency, inadequacy or failure shall continue for a period of 24 hours after written notice thereof is given by Contractor to Subcontractor,

a result we did not anticipate this delay nor did we allow for it in our estimate.

"Similar conditions to the above stated have existed in the immediate area of Structure B–6 and B–7 for approximately two months causing us both delay and added expense by not having working room necessary for proper execution of the operation.

"Based on the above stated conditions we hereby request that no time be charged for the portion of work mentioned until Blackwell has completed his contract and moves his equipment out of our Right of Way."

then Contractor may, at its option and without further notice: Supply the necessary labor, materials or other items and be entitled to reimbursement from Subcontractor for the cost thereof; or, Contractor may terminate the employment of Subcontractor hereunder and proceed to complete the work, by such means and in such manner as Contractor alone may deem expedient, utilizing any and all monies that may be due Subcontractor at that time, and all materials, equipment, tools and other property of Subcontractor on the job site, without any payment for the use of same. In the event of such termination, no further sums shall be paid to Subcontractor until said work is completed, and Contractor shall be entitled to retain from the balance then due Subcontractor hereunder the cost of such completion and the amount of any damages resulting from Subcontractor's default. If said cost of completion and damages shall exceed said balance due, Subcontractor shall promptly pay the amount of such excess, upon Contractor's demand, and Contractor shall have a lien upon and the right to retain possession of all materials, equipment, tools and other property of Subcontractor to secure payment thereof."

On August 13 Wright wrote Delta confirming a telegram sent on the same date, as follows:

"In accordance with Paragraph 9 of your said Subcontract with us, you are instructed to increase your work force and equipment within 15 days of the date hereof, to our satisfaction, or we will supply the necessary labor, materials and other items at your expense for prompt completion of your items of work."

The letter closed with the comment that "It is hoped that you will be able to remedy this default".

The first of the severe floods of Cabin John Creek occurred less than a week thereafter and everybody was busy with salvaging operations for a while. Around 85% of the form work had been carried away. About the time of the first flood, at the request of Wright, the Masseys had begun the preparation of a schedule showing the time within which they hoped to be able to complete the various items of work they were to do. The floods seriously disrupted this schedule. The delay of Blackwell in making available certain material for forms, which the Masseys planned to use in their form work for reasons of economy, and which was afterwards used by Wright for the same reasons, also affected the schedule. The Commission did not consider that there had been any unreasonable delay in the work. Nevertheless, on September 4, 1964, less than a week after the second flood, Wright wrote Stump, Harvey & Company, as follows:

"As per our telephone conversation this date this letter is to inform you that the subject contractor has not increased his work, remains behind schedule, and his indebtedness to Wright Contracting Company is increasing on his subcontract with us for Project No. M–512–54–60–61–62–320, Cabin John Parkway, Montgomery County, Maryland.

"Due to these facts, it becomes necessary for us to complete the contract."

A meeting was held on September 11, attended by representatives of Wright, the Masseys and Gilliam, Claims Manager of Glens Falls. One of Gilliam's assistants had previously made some investigation of the matter. At that meeting Glens Falls knew or was charged with knowledge of the supplemental letter agreement dated February 21, 1963, but did not know and was not charged with knowledge of the various acts of Wright which had changed the arrangement into what was, in effect, a taking over of the Delta organization by Wright. The Masseys were anxious to preserve whatever rights they might have had as subcontractor rather than as employees, and Wright was anxious to hold Glens Falls liable under its bond. At the September 11 meeting it was agreed that Delta

should have an extension of 30 days beyond the times filed by its tentative completion schedule, and a comment by Stump that the Glens Falls bond covered Delta's liability for materials was not challenged by Gilliam. The Court finds that on September 11 Glens Falls waived any defense it might have had by reason of the letter agreement of February 21, but this Court finds and holds that Glens Falls did not waive any rights it may have by reason of the change in the arrangement between Wright and Delta after the letter agreement and during the actual operation of the work, as set out above.

After September 11 the Masseys had or brought sufficient equipment and employees on the job and proceeded with reasonable dispatch under the circumstances to complete the work, which was further delayed by a third flood. On or a few days before October 10, however, Glens Falls learned about the actual arrangement between Wright and Delta, and on October 10 Glens Falls notified Wright that it considered its bond null and void. On October 12 Wright wrote Glens Falls, as follows:

> "Pursuant to our prior notice to you of default by Delta Coastal Corporation in failing to satisfactorily perform sub-contract dated 20 February 1963, for work agreed to be performed on the above described project, we hereby give you notice that we shall take over the work of this Subcontractor beginning October 16, 1963.

> "We shall look to you as Surety on Performance and Payment bond dated the 20th day of April, 1963, to reimburse us for all of our past and future expenditures due to this Sub-contractor's default."

Wright did not advise the Masseys that it had written this letter to Glens Falls or that it intended to "take over the work" on October 16. Between October 12 and October 16 the Masseys completed and delivered to Wright a complicated and careful engineering plan for the performance of some difficult work remaining uncompleted.

On Monday, October 17, a representative of Wright sought out Robert Massey, read him Wright's letter of October 12 to Glens Falls, and told Massey that his contract was terminated as of 7:30 a. m. that day. Massey asked that he be permitted to finish the day, but his request was denied. Wright paid off the men, but actually rehired many of them. Wright then engaged a private detective agency to patrol the site in order to prevent the Masseys from reclaiming any of their own tools or equipment. One week later, on October 24, Wright wrote to the State Roads Commission, requesting permission to shut down the job on a partial basis as of November 1 because of weather conditions. The effect of the partial shut-down was to extend the time of completion for a period equal to the period of the partial shut-down except for a number of days based to the percentage of the total job actually accomplished during the partial shut-down. The work remained in partial shut-down until April 1, 1964.

Wright did very little work during the winter and worked on B–6 and B–7 at a leisurely pace during the spring and summer of 1964. The contract was not substantially completed until October, 1965, and even at the time of trial, June, 1965, had not been opened to traffic. A representative of the Commission testified that the Masseys' work was not seriously in arrears in October, 1963.

The only effect of terminating the Delta subcontract was to put the two Massey brothers off the Wright payroll and to enable Wright to make claim against Delta and Glens Falls, as its surety, for a very large percentage of the salaries of the Wright supervisors during the shut-down period from November 1, 1963, to April 1, 1964, and for the rental value of a large number of expensive items of heavy equipment which Wright kept on the site unused, during most of the partial shut-down from November 1 to April 1.

### Conclusions

The facts of most cases are unique in the proper meaning of that term; the

facts of this case are unique in the popular meaning, very unusual. Indeed, they are so unusual that no precedent has been found for the decision of any of the major questions presented.

■■ The letter of February 21, 1963, supplemented the subcontract bonded by Glens Falls, and its execution did not release Glens Falls from liability under its bond;[8] on the other hand, the letter did not make Glens Falls liable for the credit risk assumed by Wright in agreeing to finance Delta's payroll and the purchase of certain materials.[9]

Almost immediately after work on the subcontract began, Wright and Delta abandoned the written contract, which provided that Delta should be a subcontractor, and proceeded under a modified arrangement which made the officers and employees of Delta in fact employees of Wright, subject to Wright's direct control.

■ The change in the relationship between Wright and Delta during the course of the work was so complete and material that it amounted to an abandonment of the subcontract which was the basis of the Glens Falls bond, and replaced the subcontract with an arrangement which Glens Falls did not bond and would not have bonded. That change released Glens Falls from any liability under its surety bond on ordinary principles of the law of suretyship. See Equitable Surety Co. v. United States, to Use of W. McMillan & Son, 234 U.S. 448, 34 S.Ct. 803, 58 L.Ed. 1394 (1914); United States v. Freel, 186 U.S. 309, 22 S.Ct. 875, 46 L.Ed. 1177 (1902), aff'g 2 Cir., 99 F. 237 and E.D.N.Y., 92 F. 299; Maryland Casualty v. City of South Norfolk, 4 Cir., 54 F.2d 1032, 1036, 1037 (1932);

Fidelity & Casualty Co. v. Metal Window Products Co., 4 Cir., 30 F.2d 56, 58 (1929); Massachusetts Bonding & Ins. Co. v. John R. Thompson Co., 8 Cir., 88 F.2d 825 (1937); Bopst v. Columbia Casualty Co., D.Md., Chesnut, J., 37 F.Supp. 32, 34 (1940), and additional cases cited therein.

■ The change in relationship was not known to Glens Falls until on or a few days before October 10, 1963, and Glens Falls promptly denied any liability under its bond. Its right to do so was not barred on grounds of waiver or estoppel by anything it did or did not do on September 11, when the true facts were withheld from it.

It is unnecessary to decide whether Glens Falls was relieved from liability on another ground, namely, illegality or public policy, because Wright had sought to evade the rule of the State Roads Commission with respect to subcontractors, which was made a part of the principal contract.[10]

■ The respective rights and obligations of Wright and Delta under the new arrangement present a more difficult problem. At the time the subcontract was executed by Wright in February, 1963, Wright knew that the work on B–6 and B–7 would be delayed by Blackwell, and knew or should have known that it would probably cost more than $226,000 to complete the work. The Court does not find that Wright was guilty of any fraud on Delta or the Masseys or any illegal concealment with respect to the probable cost of the work; the Masseys obviously made a foolish contract, on which they had in fact little or no chance to make a profit. Delta is not entitled to recover punitive or other damages for the

8. See Glens Falls Indemnity Co. v. Basich Bros. Const. Co., 9 Cir., 165 F.2d 649 (1948). The change in the relationship between the parties in the instant case, after the work began, of which the surety had no knowledge, presents an entirely different situation from that presented in the Basich Bros. case.

9. See generally Boka Electrical Construction Co. v. W. M. Chappell, Inc., 104 U.

S.App.D.C. 407, 262 F.2d 718, 720 (D.C.Cir., 1958).

10. See Anno.Code of Md., Art. 89B, sec. 24(a); Schloss v. Davis, 213 Md. 119, 131 A.2d 287 (1956); Basnight v. American Mfg. Co., 174 N.C. 206, 93 S. E. 734 (1917); Brandt on Suretyship, 3rd ed., sec. 19. Cf. United States F. & G. Co. v. Henderson Co., Tex.Civ.App., 253 S.W. 835 (1923).

claimed malicious and intentional misrepresentations by Wright.

The Court does not find, as contended by Delta, that Delta was forced to enter into the letter agreement of February 21 by duress or force of circumstances. Moreover, it appears from the evidence that the Masseys went along with the new arrangement, reluctantly and with some protest, but without taking any position strong enough to support their contention that Wright was guilty of any breach of the original contract.

 If the subcontract, as modified by the February 21 letter had remained in effect, Wright would have had no justification for terminating the subcontract under any of its terms. The failure of Delta to pay the $5,567 of bills was trifling, and due in large part to the way Wright insisted the matter be handled, which was not justified by the contract or the supplementary letter. The fact that Wright was being required to advance more money than it had expected would have been no ground for treating the contract as breached by Delta. But in view of the new arrangement acquiesced in by the Masseys, however reluctantly, Wright was not required to continue to employ the Masseys indefinitely. On the other hand, Wright has no claim against Delta or the Masseys because the total cost of the work to Wright was greater than the amount of the subcontract. This was due largely to causes beyond the control of the Masseys, some of the causes being chargeable to Wright itself, and most to Acts of God or acts of Blackwell. Nor is Delta entitled to recover from Wright for anticipated profits.

The Masseys agreed to the arrangement by which they were placed on Wright's payroll, and they were paid by Wright for each week they worked. Neither Delta nor the Masseys are entitled to recover from Wright any additional sum for the value of their services.

Delta, for its own use or for the use of the Masseys, as their interests may appear, is entitled to recover from Wright

(1) the value of any material actually paid for by Delta which was incorporated in the work; (2) the value of the equipment, tools and supplies belonging to Delta or the Masseys, which were (a) lost or damaged in the flood and for which Wright collected insurance, or (b) were confiscated or consumed by Wright in the completion of the work; and (3) the reasonable rental value of tools and equipment belonging to Delta or the Masseys used on the job by them or by Wright for the benefit of Wright, during the period they were actually in use, not while sitting idle. The rental value for the period after the takeover should not exceed the value of the equipment at that time.

Counsel will prepare an appropriate order.